**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

Civil Action No.:

**LIST SERVICES CORPORATION**, a Connecticut Corporation,

Plaintiff

v.

**DAVID CLEMEN**, an individual, and
**RED ROCK SECURED, LLC**, a Nevada Limited Liability Company,

Defendants

_____/

**COMPLAINT FOR DAMAGES AND INJUNCTIVE AND OTHER RELIEF**

Plaintiff List Services Corporation ("LSC") sues Defendant David Clemen ("Clemen")

and Red Rock Secured, LLC ("RRS"), and alleges as follows:

INTRODUCTION

1.       This is an action for damages and injunctive and other relief, asserting various

statutory and common law claims against Defendant Clemen, *inter alia*: (1) breach of non-

solicitation, confidentiality, and non-disclosure provisions of a Consulting contract between LSC

and Defendant Clemen; (2) breach of non-solicitation, non-competition, confidentiality, and non-

disclosure provisions of an Employment contract between LSC and Defendant Clemen; (3)

breach of duty of loyalty by Defendant Clemen; (4) breach of fiduciary duty by Defendant

Clemen; (5) misappropriation of LSC's trade secrets and confidential business information by

Defendant Clemen in violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat.

§§ 35-50 *et.seq.*; (6) breach of implied covenant of good faith and fair dealing by Defendant

Clemen; (7) violation of the Connecticut Unfair Trade Practices Act by Defendant Clemen.

Furthermore, LSC is bringing an action for damages and injunctive relief and other relief against

1

both Defendant Clemen and Defendant RRS for tortious interference with contractual business relations, and misappropriation of trade secrets in violation of the Defend Trade Secrets Act 18 U.S.C. § 1836(b).

2.     This action arises out of a scheme orchestrated by Defendant Clemen, while employed at the executive level at LSC, to misappropriate LSC's trade secrets and other confidential proprietary information, to solicit LSC's key employees to terminate their employment at LSC to become employed by Defendant RRS in violation of the Connecticut Uniform Trade Secrets Act, the Connecticut Unfair Trade Practices Act, and his non-solicitation, non-compete, and confidentiality obligations in his Consultant and Employment agreements with LSC. This action further arises out of Defendant RRS's contribution to this scheme, including its misappropriation of LSC's trade secrets, and tortious interference with LSC's contractual relations by working with and inducing Defendant Clemen to divulge LSC's trade secrets, using LSC's trade secrets, and interfering with LSC's employment agreements and client relationships to LSC's detriment.

3.     LSC's claims against Defendant Clemen arise out of both his (a) past torts, contractual breaches, and statutory violations with respect to LSC, and (b) ongoing torts, contractual breaches, and statutory violations with respect to LSC.

4.     LSC's claims against Defendant RRS arise out of its past and ongoing torts and statutory violations with respect to LSC.

5.     LSC is entitled to immediate relief including a preliminary injunction because Defendant Clemen's and Defendant RRS's unlawful conduct has caused irreparable harm to LSC for which there is no adequate remedy at law and will continue to cause the same absent injunctive relief.

## PARTIES

6.      At all times mentioned, LSC is and was a Connecticut Corporation with its

principal place of business in Bethel, Connecticut, and is, and was at all times mentioned,

conducting business in Connecticut.

7.      Defendant Clemen is upon information and belief, and was at all times mentioned,

an individual residing in the State of Connecticut.

8.      Defendant RRS is a Nevada Limited Liability Company and currently conducts

business in California. Upon information and belief its principal place of business is in El

Segundo, California, and it is authorized to do business in California. Upon information and

belief RRS operates an office at 898 Pacific Coast Hwy, El Segundo, CA 90245.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1332 and the Court's supplemental jurisdiction extends to the state law claims.

10.     Venue of this action is proper under 28 U.S.C. § 1391(b).

## FACTS

11.     LSC is a Digital Agency and Database Services provider created in 2007 with its

origins dating back to 1979. Led by President and Chief Executive Officer Joe McCluskey, Chief

Financial Officer and Chief Operating Officer Tom Hewitt, Senior Advisor Ed Mallin, current

Vice President of Digital Marketing Services, and Director of Data Acquisition Kate McCall,

LSC serves its clients by providing data driven internet marketing services. LSC maintains a

team of top tier talent with high levels of expertise in several areas including email marketing

campaigns, digital advertising operations, digital marketing, sales, marketing databases, and

account management.

12.     On September 1, 2015, Plaintiff offered Clemen a consultant position at LSC. The consulting position was as an at will 1099 contractor.

13.     Clemen accepted the offer and on September 14, 2015, Clemen and LSC entered into a Consulting Agreement. A true and accurate copy of the Consulting Agreement is attached and made a part hereto as Exhibit A.

14.     Pursuant to Section 1 of the Consulting Agreement, LSC engaged Clemen to provide LSC with *inter alia*, consulting services, account management services, and Marketo [marketing automation software] Support Services, including "analytics, deployment and creative services." (*See* Exhibit A, page 1).

15.     Section 3, "Restrictive Covenants" of the Consulting Agreement provides:

> This Restrictive Covenant prevents the CONSULTANT from contracting and/or soliciting in any manner any of the LSC managed clients predating this Agreement or any LSC originated prospects, clients or customers. This Restrictive Covenant shall continue in full force and for a period of two (2) years after the termination of the Agreement.

(*See* Exhibit A, page 1).

16.     Section 5, "Confidential Information" of the Consultant Agreement provides in part: "CONSULTANT agrees to hold LSC's Confidential Information in strict confidence and not to disclose such Confidential Information to any third parties." This Section 5 provides in part, "'Confidential Information' as used in this Agreement shall mean all information disclosed by LSC to CONSULTANT that is not generally known in the LSC's trade or industry and shall include, without limitation…trade secrets…new service offerings or products, marketing and selling, business plans…suppliers and customers… [and] any information regarding the skills and compensation of employees, contractors or other agents of LSC or its subsidiaries or affiliates." (*See* Exhibit A, page 2).

4

17.     Section 6, "Term and Termination" of the Consulting Agreement provides: "The term of this Agreement shall commence as of the Effective Date and end after one year and will auto renew unless either party provides 30 day notice of termination, however, if notice of termination is tendered by LSC for convenience during the term of this agreement." (*See* Exhibit A, page 2-3).

18.     At no point during Clemen's consultancy for LSC did David Clemen provide 30 days' notice of termination, nor did LSC provide notice of termination during that time.

19.     Section 11, "Injunctive Relief for Breach" of the Consultant Agreement provides:

> CONSULTANT's obligations under this Agreement are of a unique character that gives them particular value; breach of any such obligations will result in irreparable and continuing damage to LSC for which there will be no adequate remedy at law; and, in the event of such breach, LSC will be entitled to injunctive relief and/or a decree for specific performance and such other and further relief as may be proper (including monetary damages if appropriate).

20.     In September of 2018, Clemen and LSC began discussing the possibility of Clemen becoming an employee of LSC.

21.     Clemen continued to provide consulting services to LSC under the Consulting Agreement until October 8, 2018, when Clemen accepted an offer of employment with LSC as Vice President of Digital Operations. A true and accurate copy of the Employment Agreement signed by Clemen October 8, 2018 is attached hereto and made a part hereof as Exhibit B.

22.     The Employment Agreement provides: Compensation: "As compensation for your services hereunder, the LSC shall pay you annual draw against your Manager's Discretionary Bonus for the sum of $10,000 (Bi-weekly payments of $384.62), and a base salary of $150,000 (Bi-weekly payments of $5,769.23) on an annual basis…." (Exhibit B, page 1).

23.     The Employment Agreement further provides: Bonus/Commissions/Over Ride: "You will be paid commissions due for your override on existing digital clients revenue and new business generated on a quarterly basis…." (Exhibit B, page 1).

24.     The Employment Agreement further provides: Non-Compete / Non-Solicit Agreement: "Our standard non-compete agreement must be signed prior to start." (Exhibit B, page 1).

25.     The Employment Agreement further provides: Vacation and Personal Emergency Time Off: "Vacation is accrued on a monthly basis and is equivalent to three weeks on an annual basis. Full-time staff members earn six (6) Personal days per year. Personal days are accrued at a rate of 1.5 days per quarter." (Exhibit B, page 1).

26.     The Employment Agreement further provides: Expenses: "Normal and reasonable expenses will be reimbursed on a monthly basis per company policy."

27.     The Employment Agreement further provides: "If you are in agreement with the above outline, please sign below."

28.     The Employment Agreement was signed by Joe McCluskey on October 3, 2018 and by Clemen on October 8, 2018.

29.     Section 1 of the Non-Compete / Non-Solicitation Agreement entitled "Duties" provides:

>       The EMPLOYER shall employ the EMPLOYEE as Vice President of Digital operations, subject always to the direction and control of the Board of Directors, Officers, and their designees, and the EMPLOYEE does hereby accept such employment. Your employment with LSC is at-will and either party can terminate the relationship at any time with or without cause.

30.     Section 2 of the Non-Compete / Non-Solicit Agreement titled "Extent and Place or Business" provides *inter alia*:

The EMPLOYEE shall devote their work time, attention and best energies to the business of the EMPLOYER, and shall assume and perform such further reasonable responsibilities, in addition to services and duties as may be assigned to his from time to time by the EMPLOYER and/or its Board of Directors, provided such additional services and duties are within the scope of the EMPLOYEE's position.

31.     Section 3 of the Non-Compete / Non-Solicit Agreement titled "Non-Compete"

provides:

This Non-Compete prevents the EMPLOYEE from soliciting in any manner any of the EMPLOYER'S clients or customers, as described below.  This Non-Compete agreement shall continue to be in full force for a period of one (1) year after the termination of the Agreement or Employment.  The EMPLOYEE for a period of one (1) year after the termination of the Agreement shall not directly or indirectly induce or attempt to induce any of the clients or customers of the COMPANY (defined as companies or organizations the EMPLOYEE worked with while employed by the EMPLOYER), for the purpose of causing such clients or customers to cease doing business with List Services Corporation or LSC Digital, or otherwise discontinuing or modifying the business relationship.

32.     Section 4 of the Non-Compete / Non-Solicit Agreement titled "Non-Solicitation"

provides:

During the term of this Agreement and for two (2) years after the termination of this Agreement, the EMPLOYEE shall not directly or indirectly induce or attempt to induce any of the employees of the COMPANY to leave the COMPANY or to work for EMPLOYEE in any capacity.

33.     Section 5 of the Non-Compete / Non-Solicit Agreement titled "Confidentiality"

provides:

The EMPLOYEE for a period of three (3) years hereby agrees not to directly or indirectly disclose to anyone secret or confidential information of the EMPLOYER, such as, but not limited to, name, emails, and addresses of customers,  lists of suppliers, names and addresses of clients or prospective clients, computer programs, computer software, computer processes, methods of pricing,

development and expansion plans of EMPLOYER, lists of publications, copyrights, formats, trademarks, trade secrets, patents and other related matters used by the EMPLOYER, the supplies and costs thereof, or other information of a confidential nature which is required to be maintained as such for the continued success of the EMPLOYER and its business.   The EMPLOYEE agrees that all customer lists, names and addresses of customers made by the EMPLOYEE or obtained by the EMPLOYEE jointly or severally with any other person or persons during the entire term of this Agreement, shall be the sole property of the EMPLOYER, free from any legal and equitable title of the EMPLOYEE, and that all necessary documents for perfecting such title shall be executed and delivered to the EMPLOYER on demand.  Subsequent to employment and upon termination of this Agreement,  the EMPLOYEE shall not, directly or indirectly, disclose or use at any time, either during or subsequent to his said employment, any secret or confidential information, knowledge or data of the EMPLOYER (whether or not obtained, acquired or developed by them).

34.     The Non-Compete / Non-Solicit Agreement includes a provision titled "Rights of the Company" which provides:

It is acknowledged that the rights of the COMPANY under this Agreement are of special, unique and intellectual character which gives them a peculiar value, and that a breach of any provision of this Agreement, may cause the COMPANY irreparable injury and damage which may not be reasonably or adequately compensated in damages in an action at law. Accordingly, without limiting any right or remedy which the COMPANY may have, EMPLOYEE specifically agrees that the COMPANY shall be entitled to seek whatever legal or equitable relief is available to the COMPANY to enforce and protect its rights under this Agreement and shall be entitled to an injunction to be issued by any court of competent jurisdiction, enjoining and restraining the EMPLOYEE and all other persons, firms, partnerships or corporations therein from the continuance of such employment or other act prohibited by this Agreement.

35.     The Non-Compete / Non-Solicit Agreement includes a provision titled "At Will" which provides:

The Employee acknowledges that this Confidentiality And Non-solicitation Agreement does not constitute a contract of

employment and unless Employer and Employee are parties to a separate employment agreement (to which this Agreement would then be ancillary), this Agreement does not guarantee that the Employer will continue Employee's employment for any period of time or otherwise change the at-will nature of his/her employment.

36.     The Non-Compete / Non-Solicit Agreement includes a provision titled "Compensation" which provides:

> (a) As compensation of the EMPLOYEE'S services hereunder, the EMPLOYER shall pay and the EMPLOYEE shall accept the salary, commissions and bonus plans as agreed per the offer letter dated October 3, 2018. It is recognized between the parties that the above figure may be adjusted from time to time to reflect economic conditions, merit increases, bonuses, stock option plans, stock, etc., or any other form of compensation deemed appropriate for this EMPLOYEE as determined by the Officers and Board of Directors of the COMPANY.

37.     As Vice President of Digital Operations of LSC, Clemen was paid a salary plus commission on existing business and new business as set forth by the Employment Agreement.

38.     As Vice President of Digital Operations of LSC, Clemen represented LSC and LSC gave Clemen autonomy as an executive to manage his staff group, manage accounts, hire employees, lead client engagements, determine pricing and contracts with clients, expand services provided to existing clients, forecast sales for LSC, and report on the same.

39.     Clemen exercised superiority, influence, and control over LSC's property and interests in his role as Vice President of Digital Operations.

40.     As Vice President of Digital Operations of LSC, Clemen had access to all LSC's confidential, proprietary, and trade secret information, including but not limited to:

- all client account information inclusive of clients' budgets, strategies, account management information, and forecasts;

- LSC's account prospects;

- LSC's sales metrics and progress;

- LSC's operational information;

- LSC's administrative information;

- LSC's infrastructure information; and

- LSC's personnel records, including employee compensation plans, salaries, personnel information, and objectives and performance reviews including those given by David Clemen.

41.     LSC has invested time, money, and resources over more than a decade to develop its confidential, proprietary, and trade secret information, and depends on this information to conduct its business and serve its clients.

42.     LSC relies on the confidentiality of its confidential and proprietary business information in order to offer its clients competitive prices and high-quality services, and to attract, employ, and maintain the highest quality talent on its team.

43.     LSC protects its confidential, proprietary, and trade secret information, including but not limited to employee information, compensation information, client account information, and company financials so that this confidential, proprietary, and trade secret information is not shared or disclosed outside of LSC and its business.

44.     For example, each LSC employee has a unique login username and password that is required to access LSC's computers and confidential, proprietary, and trade secret information.

45.     All subscribed software used by LSC employees, which is used with respect to LSC's confidential, proprietary, and trade secret information, requires a user ID and password for access.

46.     LSC's highly confidential, proprietary, and trade secret client and employee information derives independent economic value from not being generally known and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information, including by giving LSC the ability to attract, hire, and retain industry talent, and provide efficient, quality, and competitive services to its clients.

47.     Clemen had a unique employee username and password for logging into LSC computers during his employment with LSC, as well as a unique username and password to access LSC's subscribed software.

48.     During the tenure of Clemen's employment as an executive of LSC, LSC was able to obtain an engagement for digital marketing for RRS through a referral from a financial writer named Trish Mahon who had previously worked with LSC and was a contractor for RRS at the time of her referral.

49.     On November 4, 2019, RRS and LSC entered into an Online Advertising and Content Engagement Agreement under which LSC would perform *inter alia* the following services for RRS: drive lead form completions, generate phone calls from potential new clients, and establish RRS as an industry thought leader through numerous channels including ongoing paid search advertising optimization and management, ongoing search engine optimization, content management of RRS's website, online reputation monitoring, content syndication utilizing social channels and paid social ads, management of email communication to existing prospects and customer lists, and reporting and communication.

50.     The monthly price for LSC's ongoing services to RRS under the Online Advertising and Content Engagement Agreement was $15,050.

51.     LSC assigned the RRS account to Clemen, as Vice President of Digital Operations.

52.     Clemen supported LSC's RRS account and acted as account manager for LSC for the duration of the Online Advertising and Content Engagement Agreement with RRS.

53.     Clemen involved the full LSC digital marketing team in supporting LSC's RRS account, including Clemen for overall management; Nicole Conte, LSC's Digital Advertising Operations Specialist, for paid search; Andrea Murray, LSC's Email Marketing Campaign Specialist, for email; and Robert Trerice, LSC's Digital Marketing Specialist, for SEO audit.

54.     Nicole Conte was a key LSC marketing team member and employee, responsible for planning, implementing, and optimizing LSC's paid advertising campaigns across display, Pay Per Click and social media channels. LSC relied on Nicole Conte's expertise and high-level skills in her area to service its clients.

55.     Andrea Murray was a key LSC marketing team member and employee, responsible for day-to-day, hands-on execution of email marketing programs for clients. Andrea Murray had been an employee of LSC for nearly a decade and had high level expertise in her area which LSC relied on in servicing its clients.

56.     During the Online Advertising and Content Engagement Agreement, Clemen made multiple trips to Los Angeles, paid for by LSC, to RRS. Clemen made his first trip to RRS in November of 2019. LSC paid $1,053.00 for this trip.

57.     Clemen coordinated with Trish Mahon in servicing the RRS account.

58.     Clemen leveraged LSC's information and expertise based on LSC's experience and success servicing other existing client accounts of LSC to provide services to RRS.

59.     As an example, Clemen sent confidential exemplary work product created for other LSC clients by email to Trish Mahon. A true and accurate copy of the October 25, 2019 email from Clemen to Trish Mahon sending confidential exemplary work product created for another of LSC's clients is attached hereto and made a part hereof as Exhibit C.

60.     The Chief Executive Officer of RRS, Sean Kelly, expressed his appreciation for the work the LSC team servicing the RRS account was doing on numerous occasions.

61.     During his tenure as Vice President of Digital Operations, Clemen developed his relationship with Sean Kelly such that he and Sean Kelly began communicating regularly about RRS matters outside the scope of LSC's service agreement with RRS.

62.     This included communications between Clemen and Sean Kelly about Trish Mahon as contractor for RRS.

63.     Upon information and belief, in these discussion between Sean Kelly and Clemen, Clemen sought to undermine the concerns Trish Mahon had with Clemen's work.

64.     Sean Kelly ultimately fired Trish Mahon.

65.     Upon information and belief, Clemen searched for her replacement on behalf of RRS and at Sean Kelly's direction.

66.     This included Clemen placing ads for new content creators for RRS.

67.     Clemen's time and efforts to assist RRS in hiring a replacement for Trish Mahon were not authorized by LSC and were not disclosed to LSC.

68.     As early as January of 2020, Clemen expressed to Tom Hewitt that Sean Kelly wanted to hire Clemen directly.

69.     In February of 2020, Sean Kelly invited Clemen and Nicole Conte directly to attend an RRS employee conference in Los Angeles that occurred on February 24th and 25th of 2020. Andrea Murray and Robert Trerice were also invited.

70.     Clemen, Nicole Conte, and Robert Trerice attended the RRS employee conference on February 24th and 25th.

71.     In total, LSC paid $3031.91 for Clemen's February travel to RRS.

72.     In total, LSC paid $1,401.81 for Nicole Conte's February travel to RRS.

73.     In total, LSC paid $548.88 for Robert Trerice's February travel to RRS.

74.     During Clemen's trip to Los Angeles for the RRS employee conference, he purchased a bottle of scotch for Sean Kelly with LSC funds which Clemen indicated was related to the issues that had been occurring with Trish Mahon.

75.     Clemen indicated that during the Los Angeles meeting with RRS, Sean Kelly was impressed with Nicole Conte and Robert Trerice.

76.     Clemen further reported that he spent time with RRS's sales leaders and sales folks and that these meetings were positive.

77.     The second day of the RRS employee conference, February 25, 2020, Clemen asked Joe McCluskey if there was a way LSC could use a proprietary email list that LSC had used for another of LSC's client for RRS, by deploying emails for RRS to that list and charging for leads from that list.

78.     Upon information and belief Clemen misrepresented to LSC that he was attending the RRS employee conference in connection with LSC's service agreement with RRS when in actuality the trip was intended to develop Clemen's and LSC's other employee's relationship with RRS for the purpose of obtaining employment positions at RRS working directly for RRS.

79.     Upon information and belief RRS invited Clemen and LSC's marketing team employees to RRS for the purpose of discussing their potential employment at RRS working directly for RRS.

80.     During February and March of 2020 shortly after Clemen's trip to Los Angeles to meet with RRS, Clemen began criticizing LSC's overall strategies and threatened to quit.

81.     During this time Clemen also began expressing irritation with other of LSC's executives.

82.     This included brash communication by Clemen to other of LSC's executives in email conversations that included LSC's staff and team members regarding potential clients.

83.     In late March of 2020 Clemen communicated to Tom Hewitt that he was going to leave LSC but would give 6-8 weeks' notice of his departure.

84.     At that time, Clemen did not indicate where he was going after leaving LSC.

85.     In March of 2020, due to COVID-19 and to enable remote working, Clemen had his team begin using Skype for all of their communications and indicated he did not want certain of LSC's executives involved in those Skype communications.

86.     On April 9, 2020, Clemen sent an email to Tom Hewitt raising concerns about work another of LSC's executives was giving to the marketing team and the marketing team's frustrations.

87.     In this email Clemen stated "You will also very likely lose your whole marketing team." A true and accurate copy of Clemen's April 9, 2020 email is attached hereto and made a part hereof as Exhibit D.

88.     This email included screenshots of Skype conversations between Clemen, Andrea Murray, and Robert Trerice. These screenshot conversations make clear that Clemen had enabled his team members to vent frustrations about other of LSC's executives to Clemen.

89.     Upon information and belief, in these Skype discussions, Clemen was undermining other LSC executives to his team.

90.     Upon information and belief, Clemen was actively attempting to reduce LSC's marketing team's confidence in LSC and its executives in the months leading up to Clemen's departure from LSC.

91.     In April 2020, Tom Hewitt accessed Clemen's LSC email account and discovered that the inbox and sent folders were nearly empty.

92.     Upon information and belief, at least as early as before April 2020, Clemen was systematically deleting emails from his LSC email account including email communications with RRS and with the LSC marketing team regarding RRS.

93.     Upon information and belief, these deleted emails included communications directly with RRS and LSC's marketing team regarding Clemen leaving LSC to work for RRS, employees of LSC also leaving LSC to work for RRS, RRS's acquisition of LSC's confidential, proprietary, and trade secret information, RRS's and Clemen's use of LSC's confidential, proprietary, and trade secret information to service RRS, and RRS's and Clemen's use of LSC's confidential employee information to solicit LSC's employees to quit and work for RRS to the detriment of LSC.

94.     In the beginning of April 2020, Clemen prepared a job description for LSC to use in finding Clemen's replacement at Tom Hewitt's request.

95.     On May 11, 2020 Clemen informed Tom Hewitt that Clemen's last day employed at LSC would be June 5, 2020.

96.     At or around this time, Clemen said that Sean Kelly wanted RRS to stop using LSC completely and for Clemen to take over all services. Clemen made assurances to Tom Hewitt that he would continue to use LSC at least for the remainder of 2020.

97.     Clemen further informed Tom Hewitt that Sean Kelly wanted Clemen to set up an office and hire a team to do RRS's marketing.

98.     Six days after Clemen's last day June 5, 2020 employed at LSC, Clemen immediately revised LSC's service agreement with RRS and removed $5,000 per month that LSC was billing RRS for marketing strategy. Clemen said he would now be providing strategy for RRS directly, and that RRS would not pay for this service from LSC now that David Clemen was RRS's employee.

99.     Clemen continued to work closely with Nicole Conte and Andrea Murray in servicing RRS.

100.    Despite his representations to LSC that RRS would continue to use LSC's services even after Clemen left LSC, Clemen canceled LSC's agreement with RRS with an effective termination date of August 31, 2020.

101.    In August 2020, Clemen stated in an email to LSC that certain LSC personnel were capable of covering Andrea Murray's duties "in a pinch."

102.    After Clemen terminated his employment at LSC, every LSC marketing team member that had been working with Clemen on the RRS account resigned from LSC: Andrea Murray, Nicole Conte, and Robert Trerice.

103.    Two of these ex-employees are known to now be working for RRS in addition to Clemen, namely, Andrea Murray, and Nicole Conte.

104.    The day after LSC's agreement with RRS terminated, Andrea Murray, LSC's Email Marketing Campaign Specialist, informed LSC on September 1, 2020 that she was resigning and taking a role working for Clemen as an employee of RRS.

105.    Andrea Murray had informed her manager, Michelle Mora (Clemen's replacement) that Clemen had made her the offer several weeks prior but wanted Andrea to wait until RRS discontinued its contract with LSC at the end of August before informing LSC that Andrea was resigning.

106.    Upon giving her resignation to LSC, Nicole Conte indicated to Tom Hewitt that Dave Clemen had given her the offer of employment with RRS a long time ago.

107.    Upon information and belief Clemen instructed Andrea Murray and Nicole Conte to systematically delete emails from their inboxes and sent folders having to do with communications directly with Clemen, and communications regarding RRS.

108.    For example, certain client-specific email folders in Nicole Conte's LSC email account, including the RRS folder and a folder designated for another client managed by Clemen, are empty, as compared to other client folders which are populated with emails.

109.    Upon information and belief, Clemen took advantage of his role as Vice President of Digital Marketing to build a personal relationship with RRS's CEO Sean Kelly for the purpose of taking Clemen's knowledge, experience, and confidential information of LSC with him to work directly for RRS.

110.    Upon information and belief Clemen and Sean Kelly worked together to scheme to have Clemen work directly for RRS to provide the same services LSC was providing under

the agreement between LSC and RRS, to cancel the use of LSC, and to take the key employees that were instrumental to LSC's business, to do the exact same work for RRS that they were performing for LSC in service of its RRS account, to the detriment of LSC.

111.    Upon information and belief, RRS induced Clemen to share LSC's confidential, proprietary, and trade secret information to cause key LSC employees to terminate their employment with LSC, including employee compensation information.

112.    As Vice President of Digital Operations of LSC, David Clemen had full knowledge and awareness of each LSC employee's compensation plan and upon information and belief, used this information to solicit LSC's employees and assist RRS in taking LSC's team members.

113.    LSC lost $15,050 per month on revenue when RRS terminated services from LSC and hired David Clemen from LSC.

114.    Now, with LSC's Email Marketing Campaign Specialist, and LSC's Digital Advertising Operations Specialist leaving LSC to work for RRS, LSC will be unable to fully service its remaining existing clients, and this could result in additional lost revenue.

115.    LSC has had to bring in contractors and consultants to replace the expertise lost by the termination of Andrea Murray's, Nicole Conte's, and Robert Trerice's employment.

116.    LSC is actively hiring replacement employees.

117.    LSC has had to communicate its turnover with its other clients which has been challenging and raised client concerns.

118.    LSC is facing difficulty in bringing on new clients because its efforts are focused on supporting its existing and remaining clients with the exemplary service and competitive prices expected of LSC.

119.     Upon information and belief, RRS has undertaken a course of conduct at least as early as February 2020 to induce Clemen to breach his obligations under his 2015 Consulting Agreement and 2018 Employment Agreement with LSC.

120.     This conduct includes directing Clemen to perform duties on behalf of RRS outside the scope of the services agreement between LSC and RRS, including directing Clemen to develop and post job descriptions to replace Trish Mahon.

121.     This conduct includes inducing Clemen to terminate his employment with LSC to work for RRS to perform the same duties for RRS that Clemen was performing for LSC to fulfill LSC's services agreement with RRS, and intentionally using LSC's confidential, proprietary, and trade secret information obtained through Clemen to obviate the services agreement with LSC.

122.     This conduct includes inviting Clemen, Nicole Conte, Andrea Murray, and Robert Trerice to RRS's employment conference in February 2020. Upon information and belief, RRS invited these LSC employees to RRS to discuss their terminating their employment with LSC, and RRS's future use of LSC's confidential, proprietary, and trade secret information.

123.     Upon information and belief, RRS has undertaken a course of conduct at least as early as February 2020 to induce at least two other of LSC's employees Nicole Conte and Andrea Murray of LSC to terminate their employment with LSC to work for RRS to perform the same duties for RRS they were performing for LSC to fulfill the services agreement between LSC and RRS.

124.     Upon information and belief, RRS intentionally used LSC's confidential, proprietary, and trade secret information including employee compensation plans obtained through Clemen, to solicit Nicole Conte and Andrea Murray to terminate their employment with LSC.

125.    Upon information and belief RRS has at engaged in this conduct with knowledge that LSC's confidential, proprietary, and trade secret information was confidential and that Clemen was under a contractual obligation to maintain that confidentiality.

126.    LSC had a substantial and ongoing contractual business relationship with Clemen, Nicole Conte, and Andrea Murray that RRS has diverted from LSC for its own benefit. In doing so, upon information and belief, RRS is inducing, and has induced Clemen to violate his obligations under the Consulting and Employment Agreement with LSC.

## COUNT ONE – BREACH OF CONSULTING AGREEMENT AS TO DEFENDANT CLEMEN

127.    LSC repeats and realleges the allegations of paragraphs 1-126 as if fully set forth herein.

128.    The Consulting Agreement between Defendant Clemen and LSC is a valid and enforceable contract, and LSC honored its obligations under the Consulting Agreement.

129.    Defendant Clemen has breached and is breaching the Consulting Agreement and unless enjoined will continue to breach his obligations under the Consulting Agreement, including in particular his non-solicitation and confidentiality obligations.

130.    Defendant Clemen's conduct has caused and stands to cause LSC substantial and immediate irreparable injury, including but not limited to the actual and potential loss of client relationships, loss of key employees, and loss of confidential information.

131.    Unless enjoined, Defendant Clemen will continue to breach his obligations and cause further such injury.

132.    As a result of these breaches, LSC has suffered damage in an amount of at least $150,000.

## COUNT TWO – BREACH OF EMPLOYMENT AGREEMENT AS TO DEFENDANT CLEMEN

133.    LSC repeats and realleges the allegations of paragraphs 1-132 as if fully set forth herein.

134.    The Employment Agreement between Defendant Clemen and LSC is a valid and enforceable contract, and LSC honored its obligations under the Employment Agreement.

135.    The Non-Compete Agreement referenced by the Employment Agreement was incorporated into the Employment Agreement and agreed to by Defendant Clemen by his entering into the Employment Agreement as an executive of LSC.

136.    Defendant Clemen has breached and is breaching the Employment Agreement and unless enjoined will continue to breach his obligations under the Employment Agreement, including in particular his non-solicitation, non-compete, and confidentiality obligations.

137.    Defendant Clemen's conduct has caused and stands to cause LSC substantial and immediate irreparable injury, including but not limited to the actual and potential loss of client relationships, loss of key employees, and loss of confidential information. Unless enjoined, Defendant Clemen will continue to breach his obligations and cause further such injury.

138.    As a result of these breaches, LSC has suffered damage in an amount of at least $150,000

## COUNT THREE – BREACH OF LOYALTY AS TO DEFENDANT CLEMEN

139.    LSC repeats and realleges the allegations of paragraphs 1-138 as if fully set forth herein.

140.    During his period of employment with LSC, Defendant Clemen owed LSC a duty of loyalty.

141.     Prior to his resignation, Defendant Clemen intentionally engaged in conduct specifically designed to compete with and injure the interests of LSC, including but not limited to working with RRS to terminate RRS's contract with LSC for LSC's provision of services, to solicit LSC's key employees to terminate their employment with LSC, to delete confidential and proprietary information belonging to LSC, and to misappropriate confidential and proprietary information belonging to LSC, and diverting its corporate opportunities.

142.     While employed by LSC, Defendant Clemen acted in furtherance of his own business interests and to the detriment of LSC.

143.     By intentionally engaging in such conduct during his employment with LSC, Defendant Clemen breached his duty of loyalty to LSC.

144.     As a result of said breach, LSC has been and will continue to be severely and irreparably damaged.

### COUNT FOUR – BREACH OF FIDUCIARY DUTY AS TO DEFENDANT CLEMEN

145.     LSC repeats and realleges the allegations of paragraphs 1-142 as if fully set forth herein.

146.     LSC had a unique degree of trust and confidence in Defendant Clemen during his employment with LSC as Vice President of Digital Operations.

147.     Defendant Clemen had superior knowledge, skill, and expertise as Vice President of Digital Operations of LSC and had a duty to act on behalf of the interests of LSC.

148.     LSC justifiably placed special trust and confidence in Defendant Clemen as an executive of LSC. Defendant Clemen exercised superiority, influence, and control over LSC's property and interests in his role as Vice President of Digital Operations.

149.     Defendant Clemen owed a fiduciary duty to LSC during his employment as LSC's Vice President of Digital Operations.

150.     Defendant Clemen breached his fiduciary duty to LSC by acting in conflict with LSC's interests, including by using an LSC-funded business trip to RRS as LSC's client to orchestrate the receipt of an employment offer from RRS, as well as orchestrate the termination of key LSC employees' employment with LSC to work for RRS to the detriment of LSC, and including by using LSC's confidential and trade secret information to do so, and by using such information to orchestrate the termination by RRS of its contract for services with LSC, to the financial advantage and benefit to Defendant Clemen and to the detriment of LSC.

151.     As a result of said breach, LSC has been and will continue to be severely and irreparably damaged.

## <u>COUNT FIVE – MISAPPROPRIATION OF TRADE SECRETS AS TO DEFENDANT CLEMEN</u>

152.     LSC repeats and realleges the allegations of paragraphs 1-151 as if fully set forth herein.

153.     LSC has invested, and continues to invest, considerable amounts of time and money in acquiring, creating, and developing confidential information and trade secrets including but not limited to its highly confidential and proprietary client and employee information.

154.     Upon information and belief, Defendant Clemen disclosed and used LSC's confidential and trade secret information to RRS and for Defendant Clemen's and RRS's benefit and to LSC's detriment, without express or implied consent by LSC.

155.    Defendant Clemen's conduct constitutes a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50, *et seq.*

156.    As a result of Defendant Clemen's violation of the Connecticut Uniform Trade Secrets Act, LSC has been and will continue to be severely and irreparably damaged.

## COUNT SIX – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO DEFENDANT CLEMEN

157.    LSC repeats and realleges the allegations of paragraphs 1-156 as if fully set forth herein.

158.    Defendant Clemen's Employment Agreement contains an implied covenant of good faith and fair dealing that obligates each party to refrain from taking any action that will decrease the consideration to which the other party is entitled under the Agreement.

159.    By his conduct, Defendant Clemen has breached the implied covenant of good faith and fair dealing.

160.    As a result of this breach, LSC has been and will continue to be severely and irreparably damaged.

## COUNT SEVEN – VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT AS TO DEFENDANT CLEMEN

161.    LSC repeats and realleges the allegations of paragraphs 1-160 as if fully set forth herein.

162.    Defendant Clemen's conduct as set forth in the foregoing paragraphs is unethical, unscrupulous, unfair, and deceptive, and constitutes an unfair method of competition or trade practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110 *et seq.* ("CUPTA").

163.    Defendant Clemen's conduct as stated in the foregoing paragraphs was intentional and willful.

164.    Defendant Clemen's violation of § 42-110 *et seq.* was carried out for the purpose of competing unfairly with LSC.

165.    As a result of Defendant Clemen's violation of CUTPA, LSC has been and will continue to be severely and irreparably damaged.

### COUNT EIGHT – TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR ADVANTAGEOUS BUSINESS RELATIONS AS TO DEFENDANT CLEMEN

166.    LSC repeats and realleges the allegations of paragraphs 1-165 as if fully set forth herein.

167.    LSC has had substantial and on-going contractual and/or business relationships with RRS, and other customers, and employees that Defendant Clemen has diverted and/or is actively attempting to divert from LSC.

168.    Defendant Clemen knew about these contractual and/or business relationships with RRS, other customers, and employees in part through his position as Vice President of Digital Operations.

169.    Defendant Clemen misrepresented to LSC that his actions in working with RRS and LSC's employees were to secure the business of RRS and fulfill LSC's obligations under the services agreement between LSC and RRS, when in fact, Defendant Clemen was using a LSC-funded business trip, and having discussions with RSS to divert and attempt to divert RRS's business, other customers, and employees from LSC.

170.    Defendant Clemen exploited LSC's confidential and trade secret information in order to divert and attempt to divert RRS's business, other customers, and employees from LSC.

171.    By engaging in the conduct described above, Defendant Clemen intentionally and unjustifiably interfered with LSC's contractual and/or advantageous business relationships with RRS, other customers, and employees.

172.    If Defendant Clemen is allowed to continue to tortiously interfere with LSC's service agreement with RRS, LSC's other customers, and LSC's contracts with its employees, LSC will be irreparably harmed with no adequate remedy at law.

## COUNT NINE – TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR ADVANTAGEOUS BUSINESS RELATIONS AS TO DEFENDANT RRS

173.    LSC repeats and realleges the allegations of paragraphs 1-172 as if fully set forth herein.

174.    Defendant RRS has undertaken a course of conduct to induce Defendant Clemen to breach his Consulting and Employment Agreements with LSC by terminating his employment with LSC to work for RRS to perform the same duties for RRS that Defendant Clemen was performing for LSC to fulfill the service agreement between Defendant RRS and LSC, and by using confidential, proprietary, and trade secret information of LSC known by Defendant Clemen and which Defendant Clemen was under an obligation to keep confidential pursuant to his Consulting and Employment Agreements.

175.    Defendant RRS has undertaken a course of conduct to induce two other employees of LSC to terminate their employment with LSC to work for Defendant RRS to perform the same duties for Defendant RRS that they were performing for LSC to fulfill the services agreement between Defendant RRS and LSC, including by using confidential, proprietary, and trade secret information known by Defendant Clemen and which Defendant Clemen was under an obligation to keep confidential pursuant to his Consulting and Employment Agreements.

27

176.    LSC had a substantial and ongoing contractual business relationship with Defendant Clemen and its other two employees described above that Defendant RRS has diverted from LSC for its own benefit. Additionally, by doing so, Defendant RRS is inducing, and has induced Defendant Clemen to violate his Consulting and Employment Agreement with LSC.

177.    By engaging in the conduct described above, Defendant RRS has intentionally and unjustifiably interfered with LSC's contractual and/or advantageous business relationship with Defendant Clemen, resulting in damages to LSC.

178.    If Defendant RRS is allowed to continue to tortuously interfere with LSC's contracts with its employees, LSC will be irreparably harmed with no adequate remedy at law.

## COUNT TEN – VIOLATION OF THE FEDERAL TRADE SECRETS ACT AS TO DEFENDANT RRS

179.    LSC repeats and realleges the allegations of paragraphs 1-178 as if fully set forth herein.

180.    LSC has invested, and continues to invest, considerable amounts of time and money in acquiring, creating, and developing confidential information and trade secrets including but not limited to its highly confidential and proprietary client and employee information, and which are related to a service used in, or intended for use in, interstate commerce.

181.    LSC's highly confidential and proprietary client and employee information is protected including by employee-specific computer login username and password, and by employee-specific login credentials to access LSC's subscribed software.

182.    LSC's highly confidential and proprietary client and employee information derives independent economic value from not being generally known and not being readily

ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information, including by giving LSC the ability to attract, hire, and retain industry talent, and provide efficient, quality, and competitive services to its clients.

183.    Upon information and belief, with knowledge that LSC's client and employee information was trade secret information that Defendant Clemen was under contractual obligation to keep confidential, Defendant RRS misappropriated LSC's trade secrets by acquiring LSC's trade secret client account and employee information through improper means, namely, by improperly inducing Defendant Clemen to disclose LSC's trade secrets to RRS.

184.    Upon information and belief, RRS misappropriated LSC's trade secrets by using LSC's trade secret client account and employee information to service its own digital marketing needs and solicit key employees from LSC to serve these needs to the detriment of LSC, without express or implied consent by LSC.

185.    Defendant RRS's conduct constitutes a violation of the Defend Trade Secrets Act 18 U.S.C. § 1836(b).

186.    As a result of Defendant RRS's violation of the Defend Trade Secrets Act, LSC has been and will continue to be severely and irreparably damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, as to all Counts, LSC respectfully requests:

I.      A Preliminary Injunction and Permanent Injunction enjoining Defendants Clemen and RRS from (a) using, disclosing, misusing, or further misappropriating LSC's confidential, proprietary, or trade secret information; and (b) soliciting LSC's employees to terminate their employment corresponding to the time period set forth in the Clemen Consulting Agreement and/or the Clemen Employment

Agreement; A Preliminary and Permanent Injunction enjoining Defendants RRS and Clemen from hiring Nicole Conte and Andrea Murray as employees or consultants and enjoining Nicole Conte and Andrea Murray from working for Defendant RRS and Clemen as employees or consultants;

II.   The following other relief:

    a.   Compensatory damages in the amount of $150,000 plus interest and costs;

    b.   An accounting of any gain received, directly or indirectly, by Defendants Clemen and RRS by virtue of the wrongful acts as described herein;

    c.   A constructive trust for the benefit of LSC over all advantages of any type received by Defendants Clemen and RRS by virtue of the wrongful acts described herein;

    d.   Punitive damages;

    e.   Attorneys' fees;

    f.   Costs; and

    g.   Such other and further relief as this Court may deem proper.

Dated: October 2, 2020

THE PLAINTIFF,
LIST SERVICES CORPORATION

By: /s/ Anthony M. Meola
Anthony L. Meola, Esq.
SCHMEISER, OLSEN & WATTS, LLP
3 Manhattanville Road, Suite 105
Purchase, New York 10577
ameola@iplawusa.com
Telephone: (914) 825-1039
Fax: (866) 865-8362

By:  Brian T. Belowich
Brian T. Belowich (CT27421)
BELOWICH & WALSH LLP
140 Grand Street, 8th Floor
White Plains, New York 10601
bbelowich@belowichwalsh.com
Telephone: (914) 265-6068
Fax: (914) 265-6168

Its Attorneys